1   NICOLA T. HANNA
    United States Attorney
2   BRANDON D. FOX
    Assistant United States Attorney
3   Chief, Criminal Division
    MACK E. JENKINS (Cal. Bar No. 242101)
4   Assistant United States Attorney
    Chief, Public Corruption & Civil Rights Section
5   VERONICA DRAGALIN (Cal. Bar No. 281370)
    Assistant United States Attorney
6   Public Corruption & Civil Rights Section
        1500 United States Courthouse
7       312 North Spring Street
        Los Angeles, California 90012
8       Telephone: (213) 894-2091/0647
        Facsimile: (213) 894-6436
9       E-mail:    mack.jenkins@usdoj.gov
                   veronica.dragalin@usdoj.gov
10
    Attorneys for Plaintiff
11  UNITED STATES OF AMERICA

12                  UNITED STATES DISTRICT COURT

13             FOR THE CENTRAL DISTRICT OF CALIFORNIA

14  UNITED STATES OF AMERICA,          No. CR 2:20-cr-00203-PA

15            Plaintiff,               COOPERATION PLEA AGREEMENT FOR
                                       DEFENDANT GEORGE CHIANG
16            v.

17  GEORGE CHIANG,

18            Defendant.

19

20       1.   This constitutes the plea agreement between GEORGE CHIANG

21  ("defendant") and the United States Attorney's Office for the Central

22  District of California ("the USAO") in the above-captioned case.

23  This agreement is limited to the USAO and cannot bind any other

24  federal, state, local, or foreign prosecuting, enforcement,

25  administrative, or regulatory authorities.

26                      DEFENDANT'S OBLIGATIONS

27       2.   Defendant agrees to:

28

FILED
CLERK, U.S. DISTRICT COURT

05/13/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

1           a.   Give up the right to indictment by a grand jury and,

2  at the earliest opportunity requested by the USAO and provided by the

3  Court, appear and plead guilty to a one-count information in the form

4  attached to this agreement as Exhibit 1 or a substantially similar

5  form, which charges defendant with Racketeer Influenced and Corrupt

6  Organization ("RICO") Conspiracy, in violation of 18 U.S.C.

7  § 1962(d).

8           b.   Not contest the Factual Basis agreed to in this

9  agreement.

10           c.   Abide by all agreements regarding sentencing contained

11  in this agreement.

12           d.   Appear for all court appearances, surrender as ordered

13  for service of sentence, obey all conditions of any bond, and obey

14  any other ongoing court order in this matter.

15           e.   Not commit any crime; however, offenses that would be

16  excluded for sentencing purposes under United States Sentencing

17  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

18  within the scope of this agreement.

19           f.   Be truthful at all times with the United States

20  Probation and Pretrial Services Office and the Court.

21           g.   Pay the applicable special assessment at or before the

22  time of sentencing unless defendant has demonstrated a lack of

23  ability to pay such assessment.

24       3.   Defendant further agrees to cooperate fully with the USAO,

25  the Federal Bureau of Investigation ("FBI"), and, as directed by the

26  USAO, any other federal, state, local, or foreign prosecuting,

27  enforcement, administrative, or regulatory authority.  This

28  cooperation requires defendant to:

1       a.   Respond truthfully and completely to all questions

2 that may be put to defendant, whether in interviews, before a grand

3 jury, or at any trial or other court proceeding.

4       b.   Attend all meetings, grand jury sessions, trials or

5 other proceedings at which defendant's presence is requested by the

6 USAO or compelled by subpoena or court order.

7       c.   Produce voluntarily all documents, records, or other

8 tangible evidence relating to matters about which the USAO, or its

9 designee, inquires.

10    4.   For purposes of this agreement: (1) "Cooperation

11 Information" shall mean any statements made, or documents, records,

12 tangible evidence, or other information provided, by defendant

13 pursuant to defendant's cooperation under this agreement or pursuant

14 to the letter agreement previously entered into by the parties dated

15 December 21, 2018 (the "Letter Agreement"); and (2) "Plea

16 Information" shall mean any statements made by defendant, under oath,

17 at the guilty plea hearing and the agreed to factual basis statement

18 in this agreement.

19          <u>THE USAO'S OBLIGATIONS</u>

20   5.   The USAO agrees to:

21       a.   Not contest the Factual Basis agreed to in this

22 agreement.

23       b.   Abide by all agreements regarding sentencing contained

24 in this agreement.

25       c.   At the time of sentencing, provided that defendant

26 demonstrates an acceptance of responsibility for the offenses up to

27 and including the time of sentencing, recommend a two-level reduction

28 in the applicable Sentencing Guidelines offense level, pursuant to

U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

      6.   The USAO further agrees:

        a.   Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

        b.   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed. Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.    In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.    If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

7.    Defendant understands the following:

a.    Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.    Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c.    Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d.    At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has

provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e.   The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.  That is, whether any other person, after trial, is found guilty or not guilty of any offense will have no effect on the government's sentencing recommendation for defendant.

<u>NATURE OF THE OFFENSES</u>

8.   Defendant understands that for defendant to be guilty of the crime charged in count one, that is, RICO Conspiracy, in violation of 18 U.S.C. § 1962(d), the following must be true:

a.   First, there was an agreement between two or more persons that: (i) an enterprise, namely, the CD-A Enterprise would exist, as alleged in the Information; and (ii) a member of the agreement associated with the CD-A Enterprise would conduct or participate, directly or indirectly, in the conduct of the CD-A Enterprise affairs through a pattern of racketeering activity, as described in the Information;

b.   Second, defendant became a member of the agreement knowing of its purpose and agreeing to further or facilitate it; and

c.   Third, the CD-A Enterprise would or did engage in, or its activities would or did affect, interstate or foreign commerce. An "enterprise" includes a group of people associated together for a

6

common purpose of engaging in a course of conduct over a period of time. "Racketeering activity" refers to the commission of multiple acts chargeable under provisions of federal and state law listed in the RICO Act, including Honest Services Fraud through Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1346, 1341, and 1343, and Giving or Offering a Bribe, in violation of California Penal Code § 67, and Requesting or Taking a Bribe, in violation of California Penal Code § 68. A "pattern of racketeering activity" is at least two racketeering acts, the last of which occurred within ten years of the commission of a prior act of racketeering, that have a relationship to each other and pose a threat of continuity. Conduct forms a pattern if it consists of criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated. Defendant admits that defendant is, in fact, guilty of this offense as described in count one of the Information.

<u>PENALTIES</u>

9.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 1962(d) is: 20 years' imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part

of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

12. Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty. Defendant and the USAO agree to the statement of facts attached hereto as <u>Attachment A</u> and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 14 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

13.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

14.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. §§ 2E1.1(a)(2);<br>2C1.1(a)(1) |
| More than 1 Bribe: | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Bribe Value >$250,000: | +12 | U.S.S.G. §§ 2C1.1(b)(2);<br>2B1.1(b)(1)(G) |
| Elected Official: | +4 | U.S.S.G. § 2C1.1(b)(3) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

15.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

16.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing

9

Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

17.  Defendant understands that by pleading guilty, defendant gives up the following rights:

a.  The right to persist in a plea of not guilty.

b.  The right to a speedy and public trial by jury.

c.  The right to be represented by counsel – and if necessary have the Court appoint counsel – at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

d.  The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.  The right to confront and cross-examine witnesses against defendant.

f.  The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.  The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.  Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

18.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

19.  Defendant agrees that, provided the Court imposes a total term of imprisonment of no more than 70 months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d).

20.  The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

21.  Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible.

## EFFECTIVE DATE OF AGREEMENT

22.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

23.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely

accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a. If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b. The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c. The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d. In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant

13

agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

24.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

25.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 14 are consistent with the facts of this case.  This paragraph permits both the USAO and defendant to submit full and complete factual

information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the Factual Basis agreed to in this agreement.

26. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

27. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//
//
//
//

15

1          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2          28.   The parties agree that this agreement will be considered

3     part of the record of defendant's guilty plea hearing as if the

4     entire agreement had been read into the record of the proceeding.

5     AGREED AND ACCEPTED

6     UNITED STATES ATTORNEY'S OFFICE
      FOR THE CENTRAL DISTRICT OF
7     CALIFORNIA

8     NICOLA T. HANNA
      United States Attorney

9

10    _____        May 11, 2020
      MACK E. JENKINS                         _____
11    VERONICA DRAGALIN                       Date
      Assistant United States Attorneys

12
                                              5/11/20
13    _____        _____
      GEORGE CHIANG                           Date
14    Defendant

15    _____        May 11, 2020
      STANLEY L. FRIEDMAN                     _____
16    Attorney for Defendant                  Date
      GEORGE CHIANG

17

18

19

20

21

22

23

24

25

26

27

28

                                16

1                 CERTIFICATION OF DEFENDANT

2     I have read this agreement in its entirety.  I have had enough

3 time to review and consider this agreement, and I have carefully and

4 thoroughly discussed every part of it with my attorney.  I understand

5 the terms of this agreement, and I voluntarily agree to those terms.

6 I have discussed the evidence with my attorney, and my attorney has

7 advised me of my rights, of possible pretrial motions that might be

8 filed, of possible defenses that might be asserted either prior to or

9 at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10 of relevant Sentencing Guidelines provisions, and of the consequences

11 of entering into this agreement.  No promises, inducements, or

12 representations of any kind have been made to me other than those

13 contained in this agreement.  No one has threatened or forced me in

14 any way to enter into this agreement.  I am satisfied with the

15 representation of my attorney in this matter, and I am pleading

16 guilty because I am guilty of the charge and wish to take advantage

17 of the promises set forth in this agreement, and not for any other

18 reason.

19

20   GEORGE CHIANG                    Date
    Defendant

                                          5/11/20

1

CERTIFICATION OF DEFENDANT'S ATTORNEY

2      I am GEORGE CHIANG's attorney.  I have carefully and thoroughly

3 discussed every part of this agreement with my client.  Further, I

4 have fully advised my client of his rights, of possible pretrial

5 motions that might be filed, of possible defenses that might be

6 asserted either prior to or at trial, of the sentencing factors set

7 forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8 provisions, and of the consequences of entering into this agreement.

9 To my knowledge: no promises, inducements, or representations of any

10 kind have been made to my client other than those contained in this

11 agreement; no one has threatened or forced my client in any way to

12 enter into this agreement; my client's decision to enter into this

13 agreement is an informed and voluntary one; and the factual basis set

14 forth in this agreement is sufficient to support my client's entry of

15 a guilty plea pursuant to this agreement.

16

17 STANLEY L. FRIEDMAN                    Date   May 11, 2020
   Attorney for Defendant
18 GEORGE CHIANG

19

20

21

22

23

24

25

26

27

28

1                        **ATTACHMENT A**

2                         FACTUAL BASIS

3   **A.   Background on Relevant Persons and Entities**

4        1.   Defendant GEORGE CHIANG ("CHIANG") was a real estate broker

5   and development consultant in the Los Angeles (the "City").   From

6   2006 to 2014, defendant CHIANG was primarily engaged in property

7   management and the sale of residential and commercial property in the

8   San Gabriel Valley.

9        2.   In or around January 2014, defendant CHIANG met Individual

10  1 at an event hosted by Company D.   Shortly thereafter, Individual 1

11  invited defendant CHIANG to lunch, where Individual 1 explained that

12  he had been working for the City for nearly 30 years and was a very

13  well respected General Manager of the Los Angeles Department of

14  Building and Safety ("LADBS").   Individual 1 inquired whether

15  defendant CHIANG would be interested in becoming a consultant to

16  downtown Los Angeles area development projects and, if so, stated

17  that Individual 1 would mentor defendant CHIANG and introduce him to

18  important City officials.   During the lunch meeting, Individual 1

19  indicated that his goal was to ensure the success of Chinese projects

20  in Los Angeles, and that defendant CHIANG was qualified and would be

21  a good fit.   Defendant CHIANG understood that Individual 1 needed

22  someone who did not work for the City to interface with the Chinese

23  companies.   Defendant CHIANG agreed to accept Individual 1's

24  proposal.

25       3.   In or around September 2014, Individual 1 instructed

26  defendant CHIANG to open a corporation in order to accomplish

27  Individual 1's goals.   Defendant CHIANG established a corporation

28  offering consulting services under the name Synergy Alliance

DEFT. INITIALS *G.C*

1  Advisors, Inc. ("Synergy").  After defendant CHIANG established
2  Synergy, Individual 1 directed defendant CHIANG on how to interact
3  with City officials with respect to property development and
4  introduced defendant CHIANG to various City officials, including
5  Councilmember A and other elected officials.
6      4.   Beginning in approximately 2014, defendant CHIANG was a
7  close political ally of Councilmember A, the Councilmember for
8  Council District A ("CD-A") in the City, member of the Planning and
9  Land Use Management ("PLUM") committee and member of the Economic
10 Development committee.  Defendant CHIANG was also a close political
11 ally of City Staffer A-1, Councilmember A's Special Assistant and
12 employee of the City.  Through these relationships, defendant CHIANG
13 developed a business relationship with Justin Kim ("Kim"), a major
14 fundraiser for Councilmember A.
15     5.   Individual 1 was the Deputy Mayor for Economic Development
16 from approximately May 2016 to June 30, 2017.
17     6.   On or around August 1, 2017, Individual 1 created a real
18 estate firm and established a corporation.  Individual 1 was the sole
19 owner of Individual 1's Company.
20     7.   On or around August 15, 2017, defendant CHIANG and
21 Individual 1 created a real estate consulting and brokerage firm and
22 established a corporation under the name CCC Investment Group, Inc.
23 ("CCC Investment").  Defendant CHIANG and Individual 1 agreed to be
24 partners of CCC Investment and to share its profits equally.
25 **B.    The CD-A Enterprise**
26     8.   Throughout the period described in the attached
27 Information, the Council District A Enterprise ("CD-A Enterprise"),
28 located in the City, is and was a criminal enterprise composed of a

DEFT. INITIALS *G.C*                    2

1  group of individuals associated for a common purpose of engaging in a

2  course of conduct, which course includes bribery and honest services

3  fraud to achieve the goals of the enterprise.  The goals of the CD-A

4  Enterprise included, but were not limited to:

5          a.   enriching the members and associates of the CD-A

6  Enterprise;

7          b.   advancing the political goals and maintaining the

8  control and authority of the CD-A Enterprise by elevating members and

9  associates of the CD-A Enterprise to, and maintaining those

10  individuals' placement in, prominent political positions;

11          c.   protecting the CD-A Enterprise from detection and

12  prosecution by concealing the financial benefits flowing to City

13  officials, through means that included indirect payments to family

14  members, close associates, and consultants.

15      9.   The CD-A Enterprise was led by Councilmember A,

16  Councilmember for CD-A, who had jurisdiction over a large number of

17  development projects undergoing the application and approval process

18  in the City.  Members and associates of the CD-A Enterprise conspired

19  with one another to facilitate bribery schemes that would provide

20  Councilmember A and other City officials financial benefits and keep

21  members in power to maintain the CD-A Enterprise's political

22  stronghold in the City.

23      10.  In exchange, Councilmember A, Individual 1, and members and

24  associates of the CD-A Enterprise, would take official action to

25  ensure certain development projects and CD-A Enterprise associates

26  received favored treatment from the City and thereby secure their

27  bribe-financed influence.  In addition, members and associates of the

28  CD-A Enterprise sought political contributions from developers and

DEFT. INITIALS _G.C._                    3

1   their proxies (e.g., lobbyists, consultants, etc.) to benefit

2   Councilmember A and his allies in exchange for official acts to

3   benefit those developers and their proxies, including defendant

4   CHIANG.

5       11.  As a result of its bribery and honest services fraud,

6   throughout the period described in the attached Information, and as

7   known to defendant CHIANG, CD-A Enterprise members and associates

8   engaged in, and their activities in some way affected, commerce

9   between one state and another state.

10  C.   **Defendant CHIANG's Role in the CD-A Enterprise**

11      12.  Beginning no later than January 2014, and continuing at

12  least until December 2018, defendant CHIANG was a member of the CD-A

13  Enterprise.  In that capacity, defendant CHIANG conspired and agreed

14  with other CD-A Enterprise members that a conspirator would commit at

15  least two racketeering acts, in the form of conspiracy to commit

16  bribery and honest services fraud, which acts had a relationship to

17  one another and the CD-A Enterprise, and posed a threat of continued

18  criminal activity.  Defendant CHIANG became a member of this

19  conspiracy knowing of this object, knowing it was illegal, and

20  intending to help accomplish it.

21      13.  Defendant CHIANG, along with other members and associates

22  of the CD-A Enterprise, operated and helped to operate pay-to-play

23  schemes within the City, wherein public officials solicited and

24  demanded direct and indirect financial benefits from developers and

25  their proxies in exchange for official acts.  Specifically, through a

26  scheme that involved bribery and honest services fraud, defendant

27  CHIANG and Individual 1 offered, facilitated, and provided some

28  combination of the following types of financial benefits to public

DEFT. INITIALS _G.C._                    4

1   officials, among others: (1) cash; (2) consulting and retainer fees;
2   (3) political contributions; (4) event tickets to concerts, shows,
3   and sporting events; and (5) other gifts.

4       14.   In exchange for such financial benefits from developers and
5   their proxies, Councilmember A and Individual 1 agreed to exert and
6   did exert pressure on other City officials to influence the approval
7   process for projects favored by the CD-A Enterprise.  In addition,
8   Councilmember A agreed to and did file motions and vote on projects
9   in various City bodies, including City Council and the PLUM
10  Committee, to benefit such projects.

11      15.   In order to advance the goals of and ensure the continued
12  existence of the CD-A Enterprise, defendant CHIANG, City Staffer A-1,
13  Individual 1, and Kim strategized ways to "protect" Councilmember A
14  to ensure Councilmember A's power and relevance within the City.
15  Defendant CHIANG coordinated with Councilmember A, City Staffer A-1,
16  Individual 1, and Kim to ensure a succession plan that would maintain
17  financial opportunities for each of them after Councilmember A's term
18  as Councilmember of CD-A expired in 2020.  On multiple occasions,
19  defendant CHIANG discussed with Councilmember A, City Staffer A-1,
20  and Individual 1 the need to ensure Relative A-1 was elected for
21  their own political and financial benefit.

22      16.   Also in furtherance of the racketeering conspiracy,
23  defendant CHIANG facilitated and participated in at least the
24  following schemes.

25  D.   **Project D Bribery Schemes**

26          a)   *Early Corrupt Relationship between Company D and*
27               *Councilmember A*

28      17.   In 2014, Company D, a China-based real estate development

DEFT. INITIALS  G.C.            5

1  company, through its subsidiaries, acquired Property D located in CD-
2  A and planned to redevelop the property ("Project D").

3      18.   In or around January 2015, defendant CHIANG began working
4  as one of the consultants for Company D on Project D, earning
5  approximately $5,000 per month.

6      19.   Between March 2014 and September 2015, defendant CHIANG and
7  Individual 1 facilitated introductions between Councilmember A and
8  Company D and its Chairman, Chairman D.  For example, on November 4,
9  2014, defendant CHIANG sent an e-mail to City Staffer A-1 with the
10  subject line "Councilmember A Fundraising," writing: "Can you get me
11  in touch with the [Councilmember A]? [Individual 1] and I had dinner
12  with [Company D] last night regarding pledging their support so I
13  want to discuss this to prepare the Councilman's dinner with them
14  this Thursday."  In the subsequent months, defendant CHIANG provided
15  in-kind contributions to Councilmember A's re-election campaign,
16  including printers, stamps, and food.

17      20.   In or around September 2015, at Councilmember A's request,
18  Company D contributed $10,000 to a high school gala event.

19      21.   In or about 2015 or 2016, both Councilmember A and City
20  Staffer A-1 asked defendant CHIANG to ask General Manager D to meet
21  with an attorney, with the stated hope that Company D would hire the
22  attorney to provide legal services for Company D.  Later, defendant
23  CHIANG learned that Relative A-1 worked at this law firm, when, on
24  February 25, 2016, City Staffer A-1 forwarded to defendant CHIANG a
25  text message from Councilmember A stating that "[Relative A-1] works
26  at [the attorney] law firm."

27      22.   In approximately 2016, at a meeting that defendant CHIANG
28  attended, Councilmember A told Chairman D that there was no need to

DEFT. INITIALS _G.C._                6

1  involve the City's Mayor in the approval process of Project D because

2  Councilmember A was the one in control of the PLUM committee.

3  Councilmember A stated that the City's Mayor could not provide help

4  to Chairman D and it was Councilmember A who drove the project.  In

5  addition, Councilmember A told defendant CHIANG privately to tell

6  Chairman D that as far as Project D was concerned, Chairman D did not

7  need anyone else but Councilmember A.  Defendant CHIANG understood

8  this to mean that Councilmember A wanted all of Chairman D's benefits

9  including contributions and money to be directed toward Councilmember

10  A and not other City officials.

11          b)    *$66,000 Bribe to Councilmember A in Exchange for*

12                *Project D Motion*

13      23.  Between November 2015 and November 2016, Councilmember A

14  solicited financial benefits from Company D, including from defendant

15  CHIANG (its consultant), Chairman D, and General Manager D, in

16  exchange for Councilmember A's official acts to benefit Project D.

17  Specifically, Chairman D and General Manager D agreed to provide

18  indirect financial benefits to Councilmember A in the form of

19  consulting fees to an associate of Councilmember A in exchange for

20  Councilmember A introducing a motion to benefit Project D.  Defendant

21  CHIANG facilitated part of this arrangement, as described further

22  below.

23      24.  On November 11, 2015, defendant CHIANG and Councilmember A,

24  City Staffer A-1, Chairman D, and General Manager D met over dinner

25  at a restaurant in Arcadia, California.  At the meeting, defendant

26  CHIANG translated for Councilmember A and Chairman D as they

27  discussed obtaining Councilmember A's support for Project D.  In

28  addition, in the same conversation, Councilmember A asked Chairman D

DEFT. INITIALS *G.C.*                7

1   to hire Councilmember A's associate on Project D.  Chairman D told

2   Councilmember A to discuss the details with General Manager D.

3       25.  On November 16, 2015, defendant CHIANG sent an email to

4   City Staffer A-1, copying General Manager D, confirming the new

5   agreement between Councilmember A and Chairman D.  Defendant CHIANG

6   wrote: "Now with a common consensus in place for [Project D], we

7   would like to roll this project full speed ahead.  Therefore, I would

8   like to request the biweekly standing meeting to restart.... From

9   this point on, we would like to communicate all aspects of our

10  project with your [CD-A] office FIRST prior to any other offices in

11  the city family.... [P]lease be ready to coordinate with Mayor's

12  office, Planning Department, and all other related parties so we can

13  drive on a singular track."

14      26.  On December 8, 2015, as part of this new agreement,

15  defendant CHIANG and Councilmember A met in person at a coffee shop

16  in Los Angeles to discuss a consulting agreement to pay one of

17  Councilmember A's associates.  At the meeting, defendant CHIANG told

18  Councilmember A that General Manager D would work with Councilmember

19  A on retaining Councilmember A's associate, who defendant CHIANG

20  later learned was Councilmember A's Associate.  Councilmember A told

21  defendant CHIANG that Relative A-1 would be involved with getting the

22  retainer consummated.

23      27.  Between December 8, 2015 and December 16, 2015, at a

24  meeting at Property D, General Manager D asked defendant CHIANG if

25  defendant CHIANG's consulting firm Synergy could hire Councilmember

26  A's Associate if, in return, Company D would increase the retainer

27  with Synergy to cover that cost.  Defendant CHIANG stated he would

28

DEFT. INITIALS  G.C.              8

1   not be involved with this arrangement because he felt it was not

2   legal.

3        28.  On December 16, 2015, defendant CHIANG facilitated an

4   introduction between Relative A-1 and a person he knew at the time as

5   "Auntie," who defendant CHIANG later learned was Chairman D's

6   relative.  Defendant CHIANG understood that the two would meet to

7   discuss an arrangement facilitated by Relative A-1 whereby Chairman

8   D's relative's company would pay a company affiliated with

9   Councilmember A's Associate.

10       29.  In May 2016, Company A, a real estate company registered to

11  Councilmember A's Associate's relative, but actually operated by

12  Councilmember A's Associate, and Chairman D's relative's company

13  executed an agreement whereby Company A would purportedly "provide

14  marketing analysis for Real Estate and Land Development Opportunities

15  in the Greater Southern California Area in the total amount of

16  $11,000.00 per month for services rendered.  The term of this

17  agreement is one (1) year with one (1) option year."  In reality,

18  defendant CHIANG prepared the monthly marketing analysis reports and

19  delivered them to Councilmember A, who then provided them to

20  Councilmember A's Associate, who collected the $11,000 monthly

21  retainer.  Defendant CHIANG, Councilmember A, Chairman D, and General

22  Manager D understood that the monthly retainer payments were intended

23  to be and were indirect bribe payments to Councilmember A in exchange

24  for Councilmember A's official acts to benefit Project D.

25       30.  On May 31, 2016, defendant CHIANG and Councilmember A had a

26  conversation via text message regarding Councilmember A obtaining the

27  monthly reports purportedly prepared by Company A (but in fact

28  prepared by defendant CHIANG) pursuant to the consulting agreement

DEFT. INITIALS G. C.                    9

1   with Chairman D's relative regarding real estate and land development
2   opportunities.

3      31.  **Real Estate Report #1:** On May 31, 2016, defendant CHIANG
4   delivered to Councilmember A his first real estate report that they
5   intended would be passed off as being created by Company A pursuant
6   to its $11,000 per month consulting agreement with Chairman D's
7   relative.

8      32.  **Real Estate Report #2:** On July 1, 2016, defendant CHIANG
9   met with Councilmember A at a coffee shop in Los Angeles, where
10  defendant CHIANG delivered his second real estate report.

11     33.  **Real Estate Report #3:** On August 1, 2016, defendant CHIANG
12  met with Councilmember A at a restaurant in Los Angeles, where
13  defendant CHIANG delivered his third real estate report.

14     34.  **Real Estate Report #4:** On September 2, 2016, defendant
15  CHIANG met with Councilmember A at a coffee shop in Los Angeles,
16  where defendant CHIANG delivered his fourth real estate report.

17     35.  **Real Estate Report #5:** On October 4, 2016, defendant CHIANG
18  met with Councilmember A at Councilmember A's residence, where
19  defendant CHIANG delivered his fifth real estate report.

20     36.  **Real Estate Report #6:** On November 3, 2016, defendant
21  CHIANG met with Councilmember A at a coffee shop in Los Angeles,
22  where defendant CHIANG delivered his sixth and final real estate
23  report.

24     37.  On November 22, 2016, Councilmember A, in Councilmember A's
25  official capacity, presented a written motion in the Economic
26  Development committee to benefit Project D (the "Project D motion").

27     38.  On December 9, 2016, defendant CHIANG and Councilmember A
28  met to discuss Councilmember A's filing of the Project D motion in

DEFT. INITIALS _G.C._                10

1  exchange for retainer fees facilitated by defendant CHIANG, Chairman

2  D, and General Manager D to Councilmember A's Associate.

3       39.  On December 10, 2016, defendant CHIANG wrote to Individual

4  1 in a text message: "please don't tell [Councilmember A] [I] told

5  you about the meeting I had with [Councilmember A].  [Councilmember

6  A] told me not to tell anyone even [City Staffer A-1]."  Defendant

7  CHIANG was referring to the financial arrangement Councilmember A had

8  with Company D, and believed that Councilmember A did not want to

9  reveal this arrangement with Company D to anyone, including City

10 Staffer A-1.

11      40.  On December 13, 2016, the City Council adopted the Project

12 D motion Councilmember A presented on November 22, 2016.

13 Councilmember A voted "yes" on the matter in City Council.

14      41.  On December 13, 2016, defendant CHIANG, Councilmember A,

15 and General Manager D met at Property D to discuss Project D and

16 Councilmember A's agreement to expedite the project going forward.

17           c)   *Additional Benefits to Councilmember A and Other City*

18                *Officials in Exchange for Official Acts*

19      42.  Between April 2017 and October 2018, Councilmember A

20 solicited additional financial benefits from Company D, including

21 from defendant CHIANG and Chairman D, in exchange for Councilmember

22 A's additional official acts to benefit Project D.  Specifically,

23 defendant CHIANG and Chairman D agreed to facilitate a trip to China

24 for Councilmember A and Councilmember A's family that was funded, at

25 least in part, by defendant CHIANG and/or Chairman D, committed

26 $100,000 to benefit Relative A-1's campaign for the CD-A seat,

27 provided event tickets and other miscellaneous expenses at

28 Councilmember A's request, in exchange for Councilmember A

DEFT. INITIALS  G.C.                11

1  facilitating the approval of Project D in the City Planning

2  Commission ("CPC"), and approving Project D in the PLUM Committee,

3  and City Council.

4      43.   In or around April 2017, at Councilmember A's request,

5  defendant CHIANG organized and coordinated a trip for Councilmember A

6  and Councilmember A's family members to visit Chairman D in China.

7  Defendant CHIANG coordinated and paid approximately $500 for visa

8  fees, and arranged for transportation for Councilmember A and the

9  family in Hong Kong.

10      44.   Between April 15, 2017 and April 23, 2017, Councilmember A

11  and Councilmember A's family visited Chairman D in Hong Kong and

12  China.

13      45.   On April 27, 2017, at Councilmember A's request, defendant

14  CHIANG provided concert tickets to Councilmember A worth

15  approximately $1,572.

16      46.   On May 19, 2017, at Councilmember A's request, defendant

17  CHIANG paid approximately $1,000 for alcohol for a party for

18  Councilmember A's relative.

19      47.   On May 21, 2017, City Staffer A-1 requested event tickets

20  from defendant CHIANG for City Staffer A-2, a CD-A staff member, who

21  had been working on Project D.  Specifically, City Staffer A-1 wrote:

22  "Also, can we please work on three tickets for lakers? Any game.

23  Want to take care of [City Staffer A-2].  I can let [City Staffer A-

24  2] know u were the one getting him 4 tickets."  On May 22, 2017,

25  defendant CHIANG purchased four Lakers tickets for approximately

26  $630, and subsequently gave the tickets to City Staffer A-1 to

27  provide to City Staffer A-2.

28

DEFT. INITIALS __G.C.__                12

48.   On June 19, 2017, at Councilmember A's request, defendant
CHIANG provided concert tickets to Councilmember A worth
approximately $1,670.

49.   On August 24, 2017, defendant CHIANG asked for
Councilmember A's help on Project D.  Specifically, defendant CHIANG
sent a text message to Councilmember A, writing: "Hi Boss, wanted to
give you heads up: [A Company D employee] spoke to chairman [D] and
CPC needs to be 9/14/17 otherwise the loan commitment from lender
will be lost for the project."  The next day, defendant CHIANG again
sent a message to Councilmember A, writing: "Hi Boss, we met with
planning yesterday and went through the outstanding items for 9/14/17
CPC.  We would need a motion from your office to direct the TFAR
allocation by next week before council recess to make the 9/14/17 CPC
hearing."

50.   On September 1, 2017, at defendant CHIANG's request,
Councilmember A presented a written motion in the PLUM committee to
benefit Company D, allowing Project D to move forward with its
application and approval process before the CPC and City Council.

51.   On September 1, 2017, Councilmember A wrote to defendant
CHIANG in a text message: "We got the motion in today."  Defendant
CHIANG understood this message to convey that Councilmember A held up
Councilmember A's end of the bargain to help Company D in exchange
for financial benefits provided by defendant CHIANG and Company D.

52.   In or around September 2017, Councilmember A used
Councilmember A's official position to pressure other officials,
including officials in the Planning Department and in Mayor's office,
to influence the approval of Project D by the CPC.

DEFT. INITIALS  G.C.                  13

1    53.  In or around November and December 2017, Councilmember A
2  asked defendant CHIANG to make a commitment on behalf of Company D to
3  contribute $100,000 to Relative A-1's campaign in exchange for
4  favorable official acts by Councilmember A to benefit Project D.
5  Defendant CHIANG, on behalf of Company D, confirmed Chairman D's
6  commitment of $100,000 to a Political Action Committee ("PAC"), PAC
7  A, that was created by Councilmember A, among others, to benefit
8  Relative A-1's campaign.

9    54.  On December 5, 2017, the PLUM Committee, including
10  Councilmember A, voted "yes" on the approval of Project D.

11    55.  On December 12, 2017, the City Council members present at
12  hearing voted to adopt the PLUM Committee report for Project D, which
13  approved the entitlements and allowed Company D to move forward in
14  the City approval process.

15    56.  In early 2018, defendant CHIANG provided approximately $800
16  in cash to City Staffer A-1.

17    57.  On January 24, 2018, defendant CHIANG, Chairman D,
18  Individual 1, Councilmember A, and Relative A-1 met for dinner at
19  Chairman D's property in San Gabriel, California.  At the dinner,
20  Chairman D pledged Chairman D's commitment and support for Relative
21  A-1's campaign for the CD-A seat.

22    58.  On March 9, 2018, Councilmember A submitted a resolution in
23  the PLUM Committee to benefit Company D, allowing Project D to move
24  forward in its approval process.

25    59.  On March 20, 2018, the City Council members present at the
26  hearing voted to adopt the Company D resolution submitted by
27  Councilmember A on March 9, 2018.

28

DEFT. INITIALS _G.C._                    14

60.  On March 29, 2018, defendant CHIANG and Councilmember A met at Councilmember A's residence to discuss Company D's support and the $100,000 contribution to PAC A to benefit Relative A-1's campaign.

61.  On March 29, 2018, Councilmember A acknowledged defendant CHIANG's agreement to facilitate a contribution to Relative A-1's campaign, writing in a text message to defendant CHIANG: "Thanks again for all your help."

62.  On April 23, 2018, defendant CHIANG wrote to Individual 1 via text message: "Below are items I'm talking to [Councilmember A] about: 1) tell [Councilmember A] that [Chairman D] is coming in June, we can talk about the PAC at that time."

63.  On April 23, 2018, defendant CHIANG and Councilmember A met at Councilmember A's residence to discuss Councilmember A's continued support for Project D in exchange for Company D's agreement to contribute $100,000 to the PAC to benefit Relative A-1's campaign.

64.  On May 18, 2018, defendant CHIANG and Individual 1 met with Councilmember A for breakfast at a restaurant in Boyle Heights. Councilmember A stated that Councilmember A needed a PAC contribution as soon as possible.  Councilmember A stated Councilmember A wanted the contribution now so that when Relative A-1 announced the candidacy, Relative A-1 would have money to pour into the campaign and scare everyone else from running against Relative A-1. Councilmember A stated that other developers already contributed in amounts of $50,000, $100,000, and $200,000.

65.  On June 12, 2018, the City Council, including Councilmember A, voted to approve the Development Agreement for Project D.  The same day, Councilmember A wrote to defendant CHIANG in a text message: "Da [Development Agreement] for [Company D] just passed

DEFT. INITIALS  _G.C._                    15

council today.  Does that mean project has been fully entitled?  Is
that our last vote?"

66.  On June 18, 2018, Councilmember A wrote to defendant CHIANG
in a text message: "When is the chairman [D] coming in to town?  We
need to finalize pac stuff.  Thanks."

67.  On July 30, 2018, the ordinance authorizing the execution
of the Development Agreement for Project D went into effect.  The
same day, Councilmember A wrote to defendant CHIANG in a text
message: "any news on when [Chairman D] is coming in to town?  Hoping
to catch dinner with [Chairman D] and talk about [Relative A-1's]
campaign."  Defendant CHIANG responded: "Hi Boss, [Individual 1] is
working on it.  I let you know after I see [Individual 1] in office
tomorrow."

68.  On October 8, 2018, Councilmember A followed up regarding
Company D, writing to defendant CHIANG in a text message: "Hey GEORGE
[CHIANG]... have time to meet soon to tie up some loose ends re the
[Company D] project?"  Defendant CHIANG understood Councilmember A to
be referencing the $100,000 commitment to the PAC to benefit Relative
A-1's campaign, which was in exchange for Councilmember A's help with
Project D.

69.  On October 16, 2018, defendant CHIANG and Councilmember A
met at Councilmember A's residence and discussed Company D's
agreement to contribute to the PAC to benefit Relative A-1's
campaign, as promised, in exchange for Councilmember A taking
multiple official acts to benefit Project D.

        d)  *Financial Benefits to Individual 1 in Exchange for*
            *Official Acts*

70.  Between January 2017 and June 2017, defendant CHIANG and

DEFT. INITIALS __G.C.__                    16

1  Individual 1 agreed that Individual 1 would assist defendant CHIANG
2  and Project D in exchange for future payments to Individual 1.
3  Specifically, Individual 1 agreed to perform and did perform official
4  acts in the capacity of Deputy Mayor of Economic Development to
5  benefit Project D.  In addition, starting in January 2017, while
6  Individual 1 was still Deputy Mayor, Individual 1 prepared an action
7  item list for Project D on a weekly basis, led project meetings, and
8  assigned tasks to defendant CHIANG and others to move the project
9  forward.  In exchange, defendant CHIANG agreed to share the lucrative
10  consulting fee and bonus payments from Company D with Individual 1.
11      71.  In or around January 2017, while Individual 1 was the
12  Deputy Mayor for Economic Development, defendant CHIANG, Individual
13  1, and Individual 1's relative strategized to have Synergy, defendant
14  CHIANG's consulting firm, take over navigating the City approval
15  process for Project D.  Defendant CHIANG negotiated a lucrative
16  consulting contract with Company D that included a monthly retainer
17  of $35,000.  The consulting contract was later modified to include
18  three significant bonus payments: (1) $100,000 for successfully
19  completing a Planning Department advisory hearing in May 2017; (2)
20  $150,000 for CPC approval in September 2017; and (3) $185,000 for
21  PLUM Committee and City Council approval in December 2017.  Defendant
22  CHIANG agreed with Individual 1 to pay a portion of these fees to
23  Individual 1, in exchange for Individual 1's assistance on Project D
24  in Individual 1's official capacity as Deputy Mayor.  As Deputy
25  Mayor, Individual 1 exerted power over and influence on various City
26  departments, including the Planning Department and the CPC.
27      72.  On January 13, 2017, defendant CHIANG, Individual 1, and
28  Individual 1's relative communicated via group text messages

DEFT. INITIALS  _G.C._            17

1   regarding Synergy taking control of the City approval process for
2   Project D.  Defendant CHIANG wrote: "Hi Dailo [brother], met with
3   chairman [D] again today.  [Chairman D] had already instructed us to
4   move forward on the project.  I need to spend some time and lay
5   everything out.  So I need to skip training tomorrow to put my
6   thoughts into context and send it to you and [Individual 1's
7   relative].  Also, my retainer has been confirmed verbally so I need
8   [Individual 1's relative] to modify it on paper for signature.  Thank
9   you!"  Individual 1 responded: "No problem.  We should meet after you
10  put your thoughts together."

11       73.  On January 26, 2017, defendant CHIANG discussed Synergy
12  taking over Project D with Individual 1 and another consultant.
13  Specifically, defendant CHIANG wrote to Individual 1 and Synergy
14  Consultant in a text message: "Hi Dailo [brother], everything went as
15  planned.  Chairman [D] spent the first part of meeting yelling at
16  everything about how their current approach is wrong.  Now Synergy
17  takes full control.  Then he walked out.  The meeting was
18  productive."

19       74.  On February 3, 2017, defendant CHIANG sent a text message
20  to Individual 1, writing: "Meeting with chairman [D] was good report
21  to you tomorrow.  Thank you!"

22       75.  On February 8, 2017, Individual 1, using Individual 1's
23  power and influence as the Deputy Mayor, coordinated a meeting
24  between a Planning Department official and representatives of Company
25  D, including defendant CHIANG and Chairman D.

26       76.  On or around March 13, 2017, Individual 1 used Individual
27  1's official position as the Deputy Mayor to pressure subordinate
28  City officials to take favorable official actions on Project D.

DEFT. INITIALS  G.C.                    18

1  Specifically, on March 13, 2017, Individual 1 sent a group text
2  message to defendant CHIANG, Individual 1's relative, and Synergy
3  Consultant: "Hi [Synergy Consultant], talked to [Fire Department
4  Official] about travel distance and tract map.  He still help.  Make
5  sure we pay expedite for the the fire review of three tract map.
6  [...] Still wait for [Transportation Department Official] to call
7  back."  Defendant CHIANG responded: "Thank you Dailo [brother]!"
8  Synergy Consultant responded: "You are the greatest...I will call
9  [Fire Department Official] first."
10      77.  On March 28, 2017, defendant CHIANG informed Individual 1
11  about his negotiations with Company D on the Synergy consulting
12  payments, in which Individual 1 had a vested interest, specifically
13  the agreement to receive a portion of the consulting fees and bonus
14  payments.  Specifically, defendant CHIANG wrote to Individual 1 in a
15  text message: "Last night I spoke to chairman [D] about late monthly
16  payment and stop of service [Chairman D] said it was all
17  misunderstanding asked me to go to [Company D] office this afternoon.
18  Let me know if you want to have meeting today?  Completely up to you
19  but I will drop by regardless to drop everything off.  Thank you!"
20      78.  On March 28, 2017, Company D paid Synergy a monthly
21  retainer fee of $35,000 by check.
22      79.  On March 28, 2017, Company D paid Synergy $46,666 by check
23  as back pay for monthly retainers for February 2017 and January 2017.
24      80.  On May 18, 2017, Company D issued a $100,000 check as the
25  first bonus payment to Synergy for successfully reaching the Planning
26  Department advisory hearing scheduled on May 24, 2017.
27      81.  Consistent with his agreement to share the bonus payment
28  with Individual 1, defendant CHIANG asked Individual 1 if Individual

DEFT. INITIALS  G.C.                 19

1 wanted Individual 1's share of the first bonus payment in check

form.   Individual 1 told defendant CHIANG to wait until later and

that Individual 1 preferred getting a bigger check at a later date.

82.   On or around June 22, 2017, in a telephone call, Individual

1 asked defendant CHIANG "when are you going to . . . get the cash

for me for the 20 grand?"  Defendant CHIANG responded, "I got it

sitting in the car," referring to $20,000 cash.  Individual 1 then

instructed defendant CHIANG to "just keep it there for now."

83.   In early 2017, Individual 1 explained to defendant CHIANG

that the Mayor's office had influence over CPC and the CPC

commissioners.  Defendant CHIANG understood that as Deputy Mayor,

Individual 1 had influence over the CPC and that Individual 1 knew

how to influence the CPC's approval of Project D.

84.   On or around August 3, 2017, defendant CHIANG, Individual

1, and City Staffer D, a senior City official working for

Councilmember D, met at Individual 1 and defendant CHIANG's office to

discuss Project D.  Individual 1 asked City Staffer D to speak to

Mayor staffer 1 to ask Mayor staffer 1 to put pressure on the CPC to

approve Project D.  City Staffer D agreed to do so.

85.   On or about August 8, 2017, Individual 1 had a meeting with

City Staffer D's relative in downtown Los Angeles at the office of

CCC Investment.  At the meeting, Individual 1 and City Staffer D's

relative discussed an arrangement for a consulting agreement.

86.   On or about August 29, 2017, at Individual 1's request,

defendant CHIANG executed a consulting agreement between CCC

Investment and City Staffer D's relative.  The consulting agreement

provided for compensation of $1,000 per month, effective September 1,

2017, for four consecutive months.  At Individual 1's request,

DEFT. INITIALS  _G.C._              20

1  between October 2017 and December 2017, CCC Investment ultimately
2  paid City Staffer D's relative approximately $2,000 for "consulting
3  services."

4      87.  On September 14, 2017, Individual 1 confirmed that
5  Individual 1 influenced Company D's CPC approval and that Individual
6  1 expected a second bonus payment from Company D, in the form of a
7  portion of defendant CHIANG's bonus, for reaching the second CPC
8  hearing milestone.  Specifically, after the CPC approval, Individual
9  1 sent a text message to Individual 1's relative, writing: "CPC
10 approved [Project D]! We are moving on to PLUM."  Individual 1's
11 relative responded: "Good news for milestones."  Individual 1 then
12 wrote: "[Mayor official 1] and [Mayor official 2] talked to the
13 commissioners.  [City Staffer D] asked [Mayor staffer 1].  You know
14 who asked [City Staffer D]."  Individual 1's relative responded:
15 "Congrats!"  Individual 1 answered: "To all of us! Still waiting for
16 the 2nd payment."

17     88.  On October 19, 2017, Company D issued a $150,000 check as
18 the second bonus payment to Synergy for Project D successfully
19 completing the CPC hearing on September 14, 2017.

20     89.  On December 14, 2017, Company D issued a $185,000 check as
21 the third bonus payment to Synergy for Project D successfully
22 completing the PLUM hearing on December 5, 2017, and the City Council
23 hearing on December 12, 2017.

24     90.  Between January 2017 and December 2017, Company D paid
25 Synergy approximately $772,536 in consulting fees and bonuses for its
26 work on Project D.  During that time period, Synergy paid Individual
27 1's company $93,939.97, and Individual 1's relative $19,000.  This
28 approximately $112,000 paid by defendant CHIANG through Synergy

DEFT. INITIALS _G.C._                21

1   indirectly to Individual 1 was in exchange for Individual 1's actions

2   in shepherding Project D through the various City approval processes

3   while Individual 1 was Deputy Mayor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFT. INITIALS *G.C.*                    22