E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar. No. 274850)
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0363 / 3289 / 3819
    Facsimile: (213) 894-6436
    E-mail:    Cassie.Palmer@usdoj.gov
               Susan.Har@usdoj.gov
               Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-203-JFW |
| Plaintiff, | GOVERNMENT'S REDACTED SENTENCING POSITION REGARDING DEFENDANT GEORGE CHIANG |
| v. | |
| GEORGE CHIANG, | Hearing Date: November 1, 2024 |
| Defendant. | Hearing Time: 8:00 a.m. |
| | Location:    Courtroom of the Hon. John F. Walter |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Cassie D. Palmer,
Susan S. Har, and Brian R. Faerstein, hereby files its Redacted
Sentencing Position Regarding Defendant George Chiang.

    This position is based upon the attached memorandum of points
and authorities, the files and records in this case, the Presentence
Investigation Report ("PSR") (Dkt. No. 46), the United States
Probation and Pretrial Services Recommendation Letter (Dkt. No. 45),

the Government's Objection to the PSR (Dkt. No. 48), and such further

evidence and argument as the Court may permit.

Dated: October 24, 2024          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 CASSIE D. PALMER
                                 SUSAN S. HAR
                                 BRIAN R. FAERSTEIN
                                 Assistant United States Attorneys

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES................................................1

MEMORANDUM OF POINTS AND AUTHORITIES................................2

I.   INTRODUCTION...................................................2

II.  STATEMENT OF FACTS............................................4

     A.   Defendant's Background...................................4

     B.   Defendant Met Chan at Hazens' Chinese New Year Event......5

     C.   Chan Trained Defendant to Pay Bribes to Public
          Officials and Recruited Defendant into the CD-14
          Enterprise..............................................6

     D.   Defendant and Chan Solicited Bribes from Hazens for
          Huizar, Chan, and Other City Officials and Defendant
          Profited Richly Himself.................................8

          1.   Defendant Facilitated the Early Corrupt
               Relationship Between Hazens, Huizar, and Chan........8

          2.   Defendant Facilitated Bribes from Hazens to
               Huizar via the Fake Real Estate Reports
               Arrangement.......................................10

          3.   Defendant Paid and Facilitated Other Bribes to
               Huizar in 2017 and 2018 to Benefit the Luxe Hotel
               Project...........................................11

          4.   Defendant Solicited Bribes from Hazens to Chan
               and Shared in the Proceeds........................11

          5.   Defendant and Chan Paid and Facilitated Bribes to
               Other City Officials to Benefit Luxe...............14

     E.   Defendant's Lies at Initial FBI Interviews and His
          Subsequent Acceptance of Responsibility and Guilty
          Plea....................................................15

III. SENTENCING GUIDELINES CALCULATIONS............................16

IV.  MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE......18

     A.   Defendant's Substantial Assistance......................19

     B.   Timeliness and Reliability of Assistance................23

V.   APPLICATION OF THE § 3553(A) FACTORS.........................23

i

A.   The Nature and Circumstances of the Offense..............24

B.   Defendant's History and Characteristics Support a
     Sentence of Three Years' Probation with 12 Months'
     Home Confinement and a High-End Fine....................27

C.   Just Punishment and Deterrence..........................30

E.   Avoiding Unwarranted Disparities........................31

IV.  IMPOSITION OF THE MAXIMUM, HIGH-END FINE OF $250,000 AND
     150 HOURS OF COMMUNITY SERVICE IS WARRANTED.................33

V.   CONCLUSION.................................................34

# TABLE OF AUTHORITIES

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

**Federal Cases**

<u>United States v. Armstead</u>,

  421 F. App'x 751 (9th Cir. 2011) ................................. 31

<u>United States v. Gardner</u>,

  32 F.4th 504, 532 (6th Cir. 2022) ............................ 31-32

<u>United States v. Spano</u>,

  411 F. Supp. 2d 923 (N.D. Ill. 2006) ..................... 26, 30-31

<u>United States v. Treadwell</u>,

  593 F.3d 990 (9th Cir. 2010) ................................... 30

<u>United States v. Watkins</u>,

  691 F.3d 841 (6th Cir. 2012) ................................... 31

**Federal Statutes**

18 U.S.C. § 3553(a)(1)....................................... passim

**Sentencing Guidelines**

U.S.S.G. § 2B1.1(b)(1)............................................ 15

U.S.S.G. § 2C1.1(b)(1).......................................... 15-16

U.S.S.G. § 2S1.1(a)............................................... 14

U.S.S.G. § 3E1.1.................................................. 16

U.S.S.G. § 4C1.1.................................................. 16

U.S.S.G. § 5B1.1.................................................. 31

U.S.S.G. § 5C1.1.................................................. 31

U.S.S.G. § 5E1.2.............................................. 32, 33

U.S.S.G. § 5F1.2.................................................. 31

U.S.S.G. § 5K1.1............................................ 3, 17, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In January 2014, when defendant George Chiang met Raymond Chan, defendant was a small-time real estate agent based in the San Gabriel Valley who had no experience with real estate development or politics.  Chan was a powerful Los Angeles ("City") official -- the General Manager of the Los Angeles Department of Building and Safety ("LADBS").  Defendant and Chan met at a Chinese New Year celebration hosted by China-based real estate developer Shenzhen Hazens Real Estate Group, Ltd. ("Hazens"), which planned to redevelop its Luxe City Center Hotel ("Luxe Hotel") in downtown Los Angeles.  During the Hazens event, defendant hobnobbed with Hazens executives he had relationships with -- including billionaire Chairman Fuer Yuan and General Manager Greg Sun -- and introduced them to Chan.

Soon after the event, defendant was surprised when Chan invited him to lunch.  Chan told defendant that Chan wanted to give Chinese real estate developers a "soft landing" in Los Angeles.  Chan explained that development consulting was lucrative and said he had been impressed with defendant during the Hazens event.  Chan suggested defendant could become a development consultant by working with Chan.  Defendant was flattered, especially given Chan's stature as an influential public official, and accepted his proposal.

Chan soon began training defendant about the development process in the City and the importance of "taking care of" -- meaning, providing benefits to -- persons with influence over the development approval process, including Chan's close associates, Los Angeles City

Councilmember Jose Huizar and his special assistant, George Esparza, to whom Chan introduced defendant.

In September 2014, Chan instructed defendant to open a consulting company -- Synergy Alliance Advisors, Inc. ("Synergy") -- and Chan and defendant struck a secret business deal to be 50/50 partners. Defendant understood that Chan needed someone to outwardly interface with Chinese developers (since Chan was barred from doing so as a City official), while Chan pulled the strings from inside the City. Over the ensuing years, defendant became an important member of the Council District 14 (CD-14) racketeering enterprise through which he facilitated direct and indirect bribes from Hazens to Huizar, Esparza, and other City officials -- ranging from event tickets to political contributions to travel accommodations to fake consulting fees -- to benefit the Luxe Hotel Project. Defendant and Chan also reaped lucrative payments for Synergy from Hazens (nearly $1.8 million), which Hazens provided as bribes to leverage Chan's and Huizar's official acts in connection with the Luxe Hotel Project.

As the government closed in on the racketeering conspiracy, defendant at first lied and tried to protect himself, Chan, and Chairman Yuan. Over time, however, defendant began contemplating the example he was setting for his two daughters. With his family in mind, defendant took accountability for his actions by cooperating fully with the government's investigation and pleading guilty. After making this decision, defendant substantially assisted the government's investigation, spending countless hours providing information, locating and producing thousands of pages of documents, tirelessly preparing to testify, and testifying in two trials.

Importantly, in addition to cooperating with the government's investigation, over the past six years defendant has forged a productive, meaningful life, by starting a new career, volunteering extensively in his community, and taking an active, caring role in his children's and family members' lives.  In light of defendant's extensive cooperation and substantial assistance to the government's investigation, the government moves for a 12-level downward departure under U.S.S.G. § 5K1.1, which would result in an adjusted total offense level of 13 and Guidelines range of 12-18 months' imprisonment.  Considering the sentencing factors under 18 U.S.C. § 3553(a), the government submits that a sentence of (1) three years' probation, with conditions of (a) 12 months' home confinement and (b) 150 hours community service; and (2) the imposition of a high-end fine of $250,000, is sufficient but not greater than necessary to achieve the goals of sentencing.

## II.  STATEMENT OF FACTS[1]

### A.  Defendant's Background

Defendant was born in Taiwan and emigrated with his family to the United States in 1989 when he was ten years old.  Defendant did not speak English when he arrived.  His childhood ███████████ ███████████████████████████████████████████, as discussed in the PSR.

Despite this, defendant enjoyed a loving relationship with his grandparents and has developed a close relationship with his parents

---

[1] Unless otherwise indicated, the facts herein are drawn from the Presentence Investigation Report ("PSR") (Dkt. No. 46), the factual basis in defendant's plea agreement (Dkt. No. 7), and defendant's sworn testimony from the two trials at which he testified.

in adulthood.  Defendant now serves as a caregiver to his elderly

relatives, including his father, who is ███████████████████

███████.  Defendant assists his father ███████████████████

███████████████████████████████.  Defendant also is

the primary caregiver to his mother-in-law ███████████████

███████████████████████████████████.  Defendant

cares for her ███████████████████████████████.

Defendant enjoys a stable, loving marriage to his wife of 25

years with whom he has two daughters.  Defendant has a close,

supportive relationship with his daughters and takes a proactive,

involved role in their lives.  Although defendant never completed

college, he has been employed since the age of 16 to support himself

and his family, including financially supporting his younger brother

through college.  Defendant has worked consistently in all manner

jobs: as a cashier at a gas station, selling cellphones, and a

salesperson and eventual store manager of a PC Club.  Starting in

2006 through 2014, defendant found success as a licensed real estate

agent and primarily sold residential and small commercial property

and handled property management in the San Gabriel Valley.

**B.   Defendant Met Chan at Hazens' Chinese New Year Event**

In January 2014, defendant met Chan at a Chinese New Year event

hosted by Hazens.  At that time, defendant had no development

experience or political fundraising experience, while Chan was the

powerful General Manager of LADBS who already had forged a corrupt

relationship with Huizar by facilitating bribes to Huizar from China-

based developer Shen Zhen New World I, LLC.  Hazens had recently

acquired the $105 million Luxe Hotel -- located in Huizar's district

1    -- with the intent to redevelop it.  At the Hazens event, defendant

2    introduced Chan to Hazens Chairman Yuan and GM Sun.

3        Soon after the event, defendant was surprised when Chan emailed

4    to thank defendant for his hospitality at the Hazens event.  Chan

5    provided his personal email address and personal phone number (not

6    his LADBS contact information).  Soon thereafter, Chan invited

7    defendant to lunch, where Chan touted his background as a respected

8    official who had worked for the City for 30 years, highlighted his

9    extensive contacts throughout the City, and explained his role as the

10   head of LADBS.  Chan discussed his passion for development and said

11   his goal was to ensure the success of Chinese developers with

12   projects in the City by giving them a "soft landing."

13       Explaining that there were opportunities in real estate

14   development in the City, Chan asked if defendant would be interested

15   in becoming a development consultant and offered to work with

16   defendant and introduce him to important City officials.  Chan told

17   defendant that he was smart, personable, and, with defendant's base

18   of Chinese clients, would be a good fit for the job.  Defendant was

19   flattered that someone of Chan's stature would pay him such

20   compliments.  Defendant understood that Chan needed someone who did

21   not work for the City to interface with the Chinese companies because

22   Chan was prohibited from doing so as a City official, but that Chan

23   could pull the strings from inside the City to help.  After speaking

24   with his wife, defendant agreed to Chan's proposal.

25       **C.    Chan Trained Defendant to Pay Bribes to Public Officials
         and Recruited Defendant into the CD-14 Enterprise**

26

27       Chan soon introduced defendant to his family, including his son,

28   Jeremy Chan ("Jeremy"), and began training defendant in his new role

                                     6

(as well one of Chan's kung fu students at his home).  Chan's tutelage focused on three topics: (1) the development process in the City; (2) Huizar's immense power as the Councilmember for downtown Los Angeles and Chair of the Planning and Land Use Management ("PLUM") Committee, which gave Huizar the ability to advance or kill projects; and (3) how to interact with Huizar and other City officials with influence over the development approval process, including the importance of "taking care of" (providing financial benefits to) them.  Chan played up his close relationship with Huizar, describing Huizar as "the boss" and a "good brother."  Above all, Chan stressed the need to keep Huizar happy by satisfying Huizar's relentless thirst for bribes.  Chan introduced defendant to Huizar and Esparza, and to their associates like Justin Kim, Huizar's top fundraiser.

In September 2014, Chan instructed defendant to open Synergy. Chan and defendant struck a secret business deal to be 50/50 partners of Synergy, each with a 50% ownership interest.  Over the ensuing years, in coordination with Chan and often at his direction, defendant became a close ally of Huizar and Esparza and an important member of the CD-14 pay-to-play enterprise.  For years, defendant furthered the goals of the racketeering conspiracy by (1) enriching himself and members and associates of the enterprise; (2) maintaining political power for the enterprise's members and associates; and (3) protecting the enterprise from law enforcement detection by concealing its criminal activities.

**D.   Defendant and Chan Solicited Bribes from Hazens for Huizar, Chan, and Other City Officials and Defendant Profited Richly Himself**

Throughout defendant's participation in the conspiracy, he facilitated direct and indirect bribes from Hazens to Huizar, Esparza, and other City officials to benefit the Luxe Hotel Project and drew substantial fees from Hazens that, in fact, were bribes directed at Chan to leverage his and Huizar's official acts.  In all, defendant paid or facilitated more than $1 million in benefits in furtherance of the CD-14 pay-to-play scheme.

1.   Defendant Facilitated the Early Corrupt Relationship Between Hazens, Huizar, and Chan

Defendant was deeply involved in the Luxe Hotel bribery scheme. In 2014, defendant arranged a series of meetings with Hazens and Chan, during which defendant and Chan sold themselves as the perfect combination to assist Hazens in obtaining the Luxe Hotel entitlements, with defendant working outside the City and Chan leveraging his official acts and immense power from inside the City. Defendant and Chan demonstrated their close bond during these meetings by referring to each other as "Dailo" (Chan), meaning big brother, and "Seilo" (defendant), meaning little brother.  Defendant and Chan arranged and attended meetings between Hazens and Huizar. During these meetings, Huizar and Chan educated Hazens about Huizar's expansive power over the City entitlements process and described Huizar as Chan's "good brother."  At Chan's direction, defendant contributed to Huizar's campaign and helped facilitate a $10,000 payment from Hazens to Huizar's alma mater high school, Salesian, where Huizar's wife Richelle Rios worked as a fundraiser.  In 2015,

8

defendant and Chan facilitated Hazens' payment of a $10,000 contribution to Huizar's post-2015 election campaign debt.

While arranging benefits from Hazens to Huizar, defendant and Chan also laid the foundation for their own payday from Hazens. Chan directed defendant to show Synergy's value by working for free to resolve problems Hazens was experiencing, including plumbing and ADA issues. Chan then used his influence and access from inside the City to efficiently resolve the issues. After providing this free work, Chan met with Chairman Yuan and GM Sun in November 2014 to push Hazens to pay Synergy as a consultant. Hazens agreed. By January 2015, Synergy secured a formal consulting contract to assist with Hazens' entitlements, earning approximately $5,000 per month. When Synergy received its first payment from Hazens, defendant and Chan discussed what to do with the money, and Chan directed defendant to invest it back into Synergy to grow their company.

After Synergy secured its initial consulting contract, defendant, Chan, and Jeremy began working on the Luxe Hotel entitlements. Defendant viewed Chan as his boss. Chan was a controlling, extraordinarily detailed, and hands-on leader. Per Chan's demands, defendant kept Chan in the loop regarding all Hazens business and apprised Chan of even minute goings-on. Defendant habitually met with Chan to develop the Luxe Hotel strategy including before and after Hazens meetings (pre-meetings and debriefs) and pawned off as his own documents and correspondence drafted by Chan and Jeremy (including letters Chan ghostwrite to and from public officials). While still Deputy Mayor, Chan prepared weekly action item lists for the Hazens Luxe Hotel Project, led project meetings, and assigned tasks to defendant, Jeremy, and others to move the

project forward.  Meanwhile, defendant, Chan, and Jeremy plotted for Synergy to take over the Luxe Hotel's lucrative entitlements process.

2.  Defendant Facilitated Bribes from Hazens to Huizar via the Fake Real Estate Reports Arrangement

In 2016, Huizar was upset with Hazens because Yuan had met with the Mayor of Los Angeles and failed to inform Huizar's office about a key announcement regarding the Luxe Hotel.  Chan arranged a dinner between Yuan and Huizar to smooth over the dispute.  During the dinner, Huizar told Yuan that Hazens did not need anyone besides Huizar to help with the Luxe Hotel Project, so there was no need to involve the Mayor.  Defendant (who was translating this private conversation) understood this to mean that Huizar wanted all Hazens benefits for himself.  Huizar pledged his support to the Luxe Hotel Project and then requested that Hazens "hire" his friend as a consultant on the project.  Chairman Yuan agreed.  This agreement evolved into the convoluted fake real estate report scheme through which Hazens paid Huizar (through Huizar's associate) indirect bribes in exchange for Huizar's official acts.

Following this meeting, defendant emailed Huizar and Esparza confirming the "common consensus" for the Luxe Hotel Project, which included an unprecedented bi-weekly meeting with Huizar's office. While Huizar initially contemplated that Rios would provide the sham real estate reports to Chairman Yuan's relative for $11,000 per report, defendant was the person who ultimately created and then hand-delivered the fake reports to Huizar over the course of six months.  Defendant believed this arrangement was illegal but continued to create the reports in accordance with Chan's directive to keep Huizar happy.  The payments were routed through companies

10

associated with Yuan's relative and Huizar's associate to disguise the bribe payments, which totaled $66,000.  Defendant understood that the payments were indirect bribes to Huizar in exchange for Huizar's official acts to benefit the Luxe Hotel Project.

        3.   <u>Defendant Paid and Facilitated Other Bribes to Huizar in 2017 and 2018 to Benefit the Luxe Hotel Project</u>

Between April 2017 and October 2018, Huizar solicited additional financial benefits from Hazens in exchange for additional official acts to benefit the Luxe Hotel Project.  At Huizar's request, defendant and Chan helped facilitate a trip to China for Huizar and his family, funded, in part, by defendant and Yuan; defendant gave Huizar pricey event tickets on Hazens' behalf and paid for expenses at Huizar's request.  These bribes were provided in exchange for Huizar's official acts.  Most significantly, defendant, in coordination with Chan, solicited a $100,000 commitment from Hazens to benefit Rios' campaign for the CD-14 seat in exchange for Huizar's official acts to benefit the Luxe Hotel Project.  Defendant followed up on this commitment countless times, keeping Chan in the loop and repeatedly appeasing Huizar and assuring him that Hazens would come through on its commitment to ensure that Huizar continued to provide favorable official acts for the project.  Before this commitment was paid, however, the FBI's investigation went overt.

        4.   <u>Defendant Solicited Bribes from Hazens to Chan and Shared in the Proceeds</u>

Defendant and Chan agreed that Chan would take official acts to assist the Luxe Hotel Project in exchange for payments to Chan from the lucrative consulting fees and bonus payments that Hazens paid to Synergy starting in January 2015.  In exchange for these payments, Chan used his access to and influence over Huizar while Chan was

General Manager of LADBS to help advance the Luxe Hotel Project, and agreed to perform and did perform official acts to benefit the project in his capacity as Deputy Mayor.

In January 2017, while Chan was Deputy Mayor, defendant, Chan, and Jeremy implemented their strategy to assume control of the Luxe Hotel Project entitlement process, eventually renegotiating the generous consulting agreement with Hazens that included a monthly retainer of $35,000 (seven times Synergy's prior monthly retainer) plus significant "milestone" bonus payments: (1) $100,000 for completing a Planning Department advisory hearing; (2) $150,000 for City Planning Commission ("CPC") approval; (3) $150,000 for PLUM Committee approval; and (4) $150,000 for City Council approval. Synergy was required to facilitate these entitlement approvals by December 30, 2017, as Hazens faced the possibility of losing funding if the Luxe Hotel Project was not approved by the end of 2017.

In early 2017, Chan (as Deputy Mayor) tasked himself with outreach to several City agencies that were involved in providing recommendations needed for the Luxe Hotel Project to clear the first milestone in the Planning Department. Defendant collaborated closely with Chan, Jeremy, and others on the Synergy team to coordinate these contacts with other public officials. After completing the Planning Department hearing in May 2017, the next milestone was the CPC, which was the most difficult because Huizar lacked voting power there. Chan explained to defendant that the Mayor's office had influence over CPC and the CPC commissioners -- and thus as Deputy Mayor, Chan could influence the CPC's approval of the Luxe Hotel Project. Indeed, in May 2017, Chan used his power and influence as the Deputy Mayor to pressure the President of the CPC to vote in favor of the

Luxe Hotel Project and to prevail upon his fellow commissioners to do the same.  The CPC ultimately approved the Luxe Hotel Project entitlements in September 2017.

Throughout the conspiracy, Chan advised and exerted pressure on Huizar, directing him to take various official acts to benefit Luxe, ultimately culminating in the PLUM Committee's and City Council's approval of the project in December 2017, just as the Hazens' contract with Synergy required.  Hazens paid Synergy milestone bonuses for each of the four entitlement approvals that Chan (with defendant's assistance) helped Hazens obtain through Chan's position as a public official and his influence over Huizar.[2]

In accordance with Chan and defendant's 50/50 Synergy agreement, half of the Hazens money belonged to Chan, in exchange for Chan's assistance on the Luxe Hotel Project in Chan's official capacity. When Hazens paid Synergy its first bonus payment, defendant asked if Chan wanted his 50 percent share, and Chan responded he preferred to get a bigger check later.  Chan also instructed Chiang to continue investing some money back into Synergy.  Chan eventually started drawing on the Hazens money after he left the City but did not fully withdraw his share before the government served subpoenas on Synergy.

In total, Hazens paid Synergy a total of $1,504,914 from January 2015 to July 5, 2018, the latter of which constituted the final payments for Synergy's assist Hazens in obtaining all entitlement-related approvals for the Luxe Hotel Project.

---

[2] Hazens paid Synergy an additional $50,000 bonus on July 5, 2018 relating to Synergy's assistance in obtaining City Council's (including Huizar's) approval for the Luxe Hotel Project's Development Agreement in June 2018.

### 5.  Defendant and Chan Paid and Facilitated Bribes to Other City Officials to Benefit Luxe

Defendant and Chan's corruption of the City processes was not limited to facilitating benefits from Hazens to Huizar and Chan. When the Luxe Hotel Project needed help that Huizar or Chan could not provide directly, defendant and Chan solicited help from other public officials in exchange for financial benefits.  In August 2017, defendant, Chan, and Deron Williams, the President of City Council's Chief of Staff, met at Synergy to discuss the Luxe Hotel Project. Chan asked Williams to speak with the Mayor's Chief of Staff to pressure the CPC to approve the Luxe Hotel Project.  Williams agreed to do so.  In exchange, Chan hired Williams's relative via a sham consulting agreement, which defendant executed at Chan's behest and which paid $1,000 per month for reports that Synergy did not need.

Defendant and Chan also gave event tickets to Shawn Kuk, the CD-14 Planning Director, who had an important role on the Luxe Hotel Project.  Notably, defendant also worked with Chan to solicit Kuk's assistance in pushing another Synergy client's project through the Planning Department in 2018, while Chan simultaneously went to great lengths to try to pay Kuk (or Kuk's relatives) $10,000, employing a convoluted scheme to obfuscate the source and purpose of the payment.

Ultimately, the entitlements for the Luxe Hotel were approved, but defendant and Chan did not stop there.  They helped route indirect benefits from Hazens to Joel Jacinto (Los Angeles Public Works Commissioner), a "good brother" with whom Chan was close.  Chan directed his associate, Andy Wang, to hire Jacinto's wife to perform sales/marketing for Wang's business.  At Chan's direction, Wang paid Jacinto's wife approximately $20,000 from June to October 2018.

During that same period, Chan (through defendant) requested expedited "B-permits" (permits required, after entitlements have been obtained, to commence construction on a project) from Jacinto for the Luxe Hotel Project.

### E. Defendant's Lies at Initial FBI Interviews and His Subsequent Acceptance of Responsibility and Guilty Plea

When confronted with his crimes, defendant initially lied, then minimized and told half-truths to protect himself, Chan, and Chairman Yuan. On November 7, 2018, when the FBI executed a search warrant on defendant (and multiple other locations), defendant agreed to speak voluntarily with agents but lied about his involvement and the involvement of others, including Chan and Yuan. In that interview and several that followed, defendant concealed his secret business relationship with Chan and denied that Chan had solicited or paid bribes or that Yuan had paid bribes.

In February 2019, however, defendant broke with his initial instincts to protect himself and others and began telling the truth. Defendant admitted that he and Chan made an agreement long before Chan retired from City employment to be partners in Synergy; Chan was always behind the scenes working on the Luxe Hotel Project; and Chan played a key part in all aspects of Synergy's business except on paper. In March 2020, defendant sat for additional interviews during which he admitted that the discussion of payments to Chan from Hazens originated when defendant first introduced Chan to Yuan; Chan needed someone who did not work for the City to interface with Chinese companies; and throughout defendant's relationship with Chan, Chan wanted to hide behind defendant's name but still maintain control and be involved with all of the Chinese developers, including Hazens.

15

Defendant also admitted key facts about Yuan's involvement in the scheme and detailed the sham real estate report arrangement, Chan's corrupt actions to push the Luxe Hotel Project through CPC, and Chan's obstructive responses to the grand jury subpoenas for Synergy documents, including instructing defendant to label non-privileged but incriminating documents as "attorney-client privileged."  From then on, defendant continued to tell the truth and to cooperate fully, as discussed in detail below.

On June 26, 2020, defendant formally accepted responsibility by waiving indictment and pleading guilty to an information charging him with a single count of Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of 18 U.S.C. § 1962(d).  (PSR ¶ 2; Dkt. Nos. 1 (Information), 7 (Plea Agreement).)[3]  In the plea agreement, defendant agreed to a detailed 22-page factual basis.  (Plea Agreement at 19-40.)  Defendant continued to provide information to the government following his guilty plea and admitted his conduct repeatedly on the stand when he testified at the two RICO trials against Chan.

**III.  SENTENCING GUIDELINES CALCULATIONS**

The parties agreed to the following Guidelines calculation in the plea agreement:

| | | |
|---|---|---|
| Base offense level | 12 | U.S.S.G. §§ 2E1.1(a)(2); 2C1.1(a)(1) |
| More Than One Bribe | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Bribe Value >$250,000 | +12 | U.S.S.G. §§ 2C1.1(b)(2); 2B1.1(b)(1)(G) |
| Bribe of Public Official | +4 | U.S.S.G. § 2C1.1(b)(3) |

---

[3] Defendant signed the plea agreement in May 2020 and pleaded guilty in June 2020.  (Dkt. Nos. 7, 28.)

16

1     **Adjusted Offense Level**     **30**

2 (Plea Agreement ¶ 14.)  The USPO adopts these same sentencing

3 factors, except for the enhancement for the value of the bribe for

4 which the USPO applies a 14-level, instead of a 12-level, increase.

5 For the reasons articulated in the Government's Objection to the PSR,

6 the government respectfully recommends that the Court adopt a 12-

7 level enhancement here.  (Dkt. 48 at 3-4.)

8     The USPO recommends a two-level reduction because defendant is a

9 zero-point offender and a three-level reduction for defendant's

10 acceptance of responsibility (PSR ¶¶ 122-26).  The government agrees

11 that both reductions apply.  Assuming the Court adopts the

12 government's recommended sentencing factors, defendant's total

13 offense level is as follows:

14     Adjusted Offense Level     30

15     Zero-Point Offender      -2  U.S.S.G. §§ 4C1.1(a), (b)

16     Acceptance            -3  U.S.S.G. §§ 3E1.1(a), (b)

17     **Total Offense Level**     **25**

18 (See Plea Agreement ¶ 14; PSR ¶¶ 122-126.)

19     The government concurs with the USPO's calculation of

20 defendant's criminal history category as I.  (Id. ¶¶ 128, 132.)

21 Under the government's calculation of the Guidelines, pursuant to the

22 plea agreement, defendant's resulting Guidelines range is 57 to 71

23 months' imprisonment.[4]

24

25

26

27 _____

28     [4] The USPO calculates defendant's Guidelines range as 70 to 87 months.  (PSR ¶ 187.)

The USPO recommends the equivalent of an approximate four-level[5] downward variance from the Guidelines based upon the sentencing factors under 18 U.S.C. § 3553(a), resulting in a recommended total sentence of 48 months' imprisonment, to be followed by a three-year term of supervised release.  (Dkt. No 45 ("Recommendation Letter") at 2, 6.)  This downward variance is based upon defendant's early acceptance of responsibility, his willingness to sell property to satisfy a criminal penalty, and his disadvantaged childhood, family ties and responsibilities, and charity work, all of which are not accounted for by the Guidelines range.  (Id. at 6.)  The government agrees that the 3553(a) factors (in addition to the government's recommended substantial assistance departure) support a modest downward variance here.

**IV.  MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**

The government moves for a 12-level downward departure under U.S.S.G. § 5K1.1 based on defendant's extraordinary cooperation.  As discussed below, defendant's timely cooperation helped the government obtain critical information and evidence relating to the Luxe Hotel bribery scheme, Chan's role in that bribery scheme, as well as the broader pay-to-play scheme, which assisted the government in charging Huizar and Chan with their broad racketeering conspiracy and obtaining convictions against them.  As described further below, over the course of nearly five years and hundreds of hours, defendant proactively cooperated by:

---

[5] A three-level downward variance results in a Guidelines range of 51-63 months' imprisonment, while a four-level downward variance results in a Guidelines range of 46-57 months' imprisonment.  Thus, the USPO's recommendation of 48 months reflects a sentence near the low-end of the range following a four-level downward variance.

- ███████████████████████████████████████
  ████████████████████████████;

- participating in over 20 interviews with the government;

- ███████████████████████████████████████████
  ████████████████████████████;

- providing information instrumental to understanding Chan's and Huizar's corrupt relationships with Hazens and the Luxe Hotel bribery scheme/evidence;

- reviewing voluminous documents and recordings, interpreting financial records, interpreting conversations in recordings and communications, and verifying translations of recordings in Mandarin in preparation of trial;

- reviewing and providing information regarding trial exhibits;

- proactively locating and providing hundreds of pages of documents, including Synergy records, Chan's obstructive "scripts," and documents on which Chan improperly wrote "Atty Client Priv"; and

- extensively preparing for and testifying in two trials in this matter.

Defendant's cooperation aided the government in obtaining convictions against defendants Huizar and Chan and securing a corporation resolution for Jia Yuan (Hazens' U.S. subsidiary), which agreed to cooperate with the government's investigation and pay a fine of over $1 million.  Put simply, defendant's cooperation was substantial by every measure: scope, value, and time expended.

**A.    Defendant's Substantial Assistance**

Starting in July and continuing through October 2019, defendant ████████████████████████████████████████████████

1  ██████████████████████████████████████████████.  From

2  2019 through the second Chan trial in March 2024, defendant

3  participated in more than 20 interviews and phone calls with FBI

4  agents and AUSAs, including several lengthy factual proffers and

5  extensive trial preparation sessions.  During the proffers, defendant

6  provided detailed information regarding his own misconduct and the

7  misconduct of others.  Among other topics, defendant provided

8  extensive information relating to the Hazens bribery scheme, Chan's

9  role and methods in carrying out that scheme, other players involved

10 in the scheme including Chairman Yuan, Chan's acts of concealment,

11 and the business deal the two struck.  This is the same information

12 that the government later used to obtain convictions against Huizar

13 and Chan with respect to the Luxe Hotel bribery scheme, as well as

14 the corporate resolution of Jia Yuan.  Defendant also provided

15 insightful context for communications between himself, Chan, and

16 other co-schemers and helped point out oversights and omissions in

17 the government's trial evidence in advance of trial.

18      Defendant's proffers included significant credible information

19 that only he could provide.  For example, defendant revealed the

20 secret business relationship with Chan starting in 2015, about which

21 the government would not have known without defendant's cooperation.

22 Defendant was able to provide details as the person inside the room

23 for key events, including his and Chan's many meetings with Hazens

24 when they sold themselves as the perfect package with defendant

25 working on the outside and Chan pulling the strings from the inside;

26 the "China Red" dinner during which Huizar pitched Chairman Yuan

27 regarding the fake consulting deal bribe in exchange for Huizar's

28 continued assistance on the project; the smoke break at the dinner in

January 2018 during which Yuan confirmed to Huizar (in front of defendant and Chan) that he would support Rios's candidacy through a $100,000 PAC contribution; and the many meetings with Huizar leading up to the final approvals of the Luxe Hotel Project where Hazens' PAC commitment was discussed and promised.  Importantly, defendant described his meetings and communications with Chan before and after these events, which were key facts establishing Chan's facilitation of these bribes.  While the government in many cases had evidence of the fact of these meetings or communications, it was defendant who explained firsthand what occurred in the rooms where they happened.

Defendant also provided key evidence about how he and Chan leveraged Chan's and Huizar's City positions to obtain the consulting fees and bonuses from Hazens.  This information was not favorable to defendant, as he further incriminated himself by disclosing that he had received the Synergy fees in exchange for Chan's official acts, which the government otherwise may not have learned.

While the government did obtain evidence about the Luxe Hotel bribery scheme without defendant (including from Esparza), defendant had the most first-hand information about Chan's actions, as Chan's right-hand man and the face of their secret business.  This testimony greatly aided the government in proving the contested issues of Chan's role, intent, and state of mind beyond a reasonable doubt at trial and by a preponderance at sentencing.

Similarly, defendant provided key information and evidence about Chan's efforts to tamper with witnesses and obstruct justice in response to FBI subpoenas and questioning, which corroborated Chan's similar obstructive conduct with respect to government informant Wang.  Defendant described Chan instructing others to leave their

phones at the front desk when discussing sensitive topics, encouraging defendant to adopt Chan's script of key events, and instructing defendant to write "attorney-client privilege" on incriminating documents that were otherwise responsive to subpoenas. These scripts, defendant explained, did not tell the full facts. This evidence helped the government prove not only Chan's criminal intent with respect to the RICO conspiracy and Luxe Hotel bribery scheme but also Chan's false statements and the specific witness tampering racketeering act alleged in the RICO conspiracy count.

As the investigation developed (and as the roster of AUSAs who interfaced with defendant expanded) and throughout trial preparation, the government repeatedly followed up with defendant for additional information and requested his help in clarifying the evidence. Defendant patiently explained the evidence and took pains to track down the answers to the government's numerous queries.

Defendant also spent significant time preparing for and then testifying for approximately five trial days total in two trials. Before trial, defendant spent countless hours confirming translations of certain recordings, which were in Mandarin, and reviewing and providing information about potential trial exhibits and defense theories and exhibits.  Defendant showed an acute attention to detail when conducting these reviews, often pointing out facts that the government had omitted or providing context for documents and communications for which the government initially had a different understanding.  Whenever the government requested defendant's assistance, he provided it, timely and thoroughly.

**B.    Timeliness and Reliability of Assistance**

Defendant began cooperating with the government in 2019.[6]  While the government had information relating to the Luxe Hotel scheme at that time, it was still developing and sifting through voluminous evidence.  Defendant's decision to cooperate enabled the government to substantially advance its understanding of the Luxe Hotel bribery scheme and to develop critical evidence against Chan and Huizar. Furthermore, throughout defendant's years-long cooperation, corroborating evidence has satisfied the government that the information defendant provided was truthful, complete, and reliable.

*    *    *

Based on the foregoing, the government believes a 12-level departure under U.S.S.G. § 5K1.1 is warranted and appropriate, and hereby moves for such a departure.  If the Court grants such departure and finds the parties' stipulated Guidelines calculations in the plea agreement applies, the resulting offense level would be 13, yielding an advisory Guidelines range of 12 to 18 months' imprisonment, which falls in Zone C.

**V.    APPLICATION OF THE § 3553(A) FACTORS**

Considering the 3353(a) factors, the government submits that a sentence of three years' probation with conditions of (a) 12 months'

---

[6] As discussed more fully in Section II.E supra, defendant first spoke with the government in November 2018 and provided some information about Huizar and others but lied about his culpability and protected Chan and Yuan.  By February 2019, defendant began telling the truth about his own conduct but continued to minimize some of his, Chan's, and Yuan's conduct.  Defendant told the full truth to the government in March 2020 and was forthcoming and fully cooperative thereafter.

home confinement,[7] (b) 150 hours community service, and (c) a fine of

$250,000[8] is sufficient but not greater than necessary to achieve the

statutory goals of sentencing.  The factors that support home

confinement in lieu of custody include defendant's personal history,

the lack of a need for specific deterrence, and defendant's fulsome

acceptance of responsibility and cooperation, as detailed above.

### A.    The Nature and Circumstances of the Offense

The nature and circumstances of the offense are undoubtedly

serious.  <u>See</u> 18 U.S.C. § 3553(a)(1).

Defendant's criminal conduct was prolonged and damaging to the

citizens of Los Angeles.  As detailed above, defendant developed a

close relationship first with Chan and then with Huizar and Esparza,

eventually becoming a seasoned member of the CD-14 Enterprise.

Defendant facilitated the corrupt relationship between Chan/Huizar

and Hazens and then leveraged Chan's and Huizar's official acts to

get favorable official acts for the Luxe Hotel Project.  Through this

---

[7] Home confinement is <u>more</u> restrictive than home detention.  The
government has consulted with the USPO and met and conferred with the
defense to fashion the following language for this condition:

> The defendant shall participate for a period of 12 months in a
> home confinement program which may include electronic
> monitoring, GPS, or automated identification system and shall
> observe all rules of such program, as directed by the Probation
> Officer.

> Defendant shall be restricted to his residence at all times
> except for the following: court appearances; legal visits;
> community service as directed by the USPO; medical appointments
> for himself and his family members; driving his children to and
> from school and activities; visits to care for his father at his
> father's home, not to exceed two visits per week; appointments
> outside his residence relating to defendant's employment, to be
> approved by the USPO; and any other activities to be
> specifically authorized by the Court.

[8] The government and defendant have agreed that defendant will
make an immediate payment of $152,000 and will pay the remainder of
the fine within six months of the judgment.

illict bargain, defendant built a prosperous new business with Chan
from the ground up and lined his own pockets with lucrative
consulting fees from Hazens.

Defendant's extensive efforts to further the goals of the
conspiracy were not the result of a lapse in judgment: they were
proactive and protracted.  Indeed, defendant facilitated and
personally paid bribes to public officials over several years.
Defendant's role in the Hazens bribery scheme was particularly vital
to its success.  While defendant may not have fully appreciated his
conduct as criminal when he embarked on his business relationship
with Chan, defendant gained a full awareness that his and his co-
schemers' actions were illegal in due time.  Despite gaining this
knowledge, defendant pushed aside his misgivings in favor of his own
self-interest and loyalty to his co-schemers.  Defendant never said
no to Chan or Huizar, even resorting to plainly illegal acts like
providing the fake real estate reports to Huizar, knowing Huizar was
reaping bribes from Hazens through the arrangement.

Defendant's actions were neither borne of economic desperation
nor a misguided effort to help Chan or Hazens.  Instead, he acted to
grow Synergy, make money, and enhance his standing with Chan, Huizar,
Esparza, Yuan, and other developers.  Indeed, defendant gained
richly: his approximate share of the money Hazens paid to Synergy was
$752,457, and his business was thriving until the FBI came knocking.

Although defendant was intimately involved in the Luxe Hotel
bribery scheme, defendant's support of the pay-to-play scheme
extended beyond it.  Defendant sought to maintain Huizar's power, and
by extension his own influence and financial opportunities, by
advancing Huizar's interests, including by soliciting contributions

from other Chinese developers to Huizar's campaign debt, Huizar's

alma mater high school, and for Rios' candidacy for Huizar's CD-14

seat.  Defendant supported Huizar's succession plan, which he

discussed repeatedly with Chan, Huizar, Esparza, and Yuan, and viewed

as a mechanism to advance his own business opportunities and wealth.

Defendant's conduct was pernicious not only because it violated

the law but also because the scheme deprived the public of their

right to Huizar's and Chan's honest services and eroded the public's

trust in its institutions and public servants.  See United States v.

Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), affirmed, 477 F.3d

517 (7th Cir. 2006) ("Public corruption demoralizes and unfairly

stigmatizes the dedicated work of honest public servants.  It

undermines the essential confidence in our democracy and must be

deterred if our country and district is ever to achieve the point

where the rule of law applies to all--not only to the average

citizen, but to all elected and appointed officials.").  By helping

Hazens obtain favorable treatment for the Luxe Hotel Project through

bribery, defendant contributed to a culture in Los Angeles that

effectively penalized honest dealings by developers who follow the

rules and wait for their projects to proceed through the normal

course of the (sometimes-lengthy) approval process.  This type of

corrosive conduct incentivizes further corruption by inviting other

corrupt developers to pay to play and threatens to infect other

politicians who come to see corruption simply as "business as usual."

In mitigation, while defendant eagerly followed Chan's

directives, actively participated in the scheme, and hungrily

profited from it, a clear power imbalance existed between defendant

and Chan, the latter of whom was a powerful public official and

someone who defendant admired and trusted and referred to as his big

brother, boss, and "Sifu" (master).  Similarly, Chan's education,

business acumen, and professional stature markedly surpassed

defendant's.  This power imbalance was only heightened with Huizar,

who defendant viewed as one of the most powerful public officials in

Los Angeles and the "king" of downtown.  And a similar power

imbalance existed with Yuan, who was a billionaire, business mogul,

and someone from whom defendant was soliciting business.  Defendant

plainly was eager to please these men and further hoped to develop

business and enrich himself through these relationships.  But he was

not on equal footing with any of them in terms of power, access, or

savvy.

On balance, the nature and circumstances of the offense demand a

meaningful sanction.

**B. Defendant's History and Characteristics Support a Sentence
of Three Years' Probation with 12 Months' Home Confinement
and a High-End Fine**

Defendant's history and characteristics strongly support home

confinement in lieu of imprisonment.  See 18 U.S.C. § 3553(a)(1).

Before defendant committed the offense, he led a meaningful,

productive life after overcoming significant obstacles.  Born in

Taiwan and raised in an unstable environment after immigrating to the

United States, defendant ███████████████████████████████████

███████ throughout his childhood and teenage years.  From the age of

16, defendant worked hard to support himself and his family

(including financially supporting his younger brother in college),

accepting all manner of work to make ends meet, like working as a gas

station cashier and a cellular phone salesperson.  Defendant

eventually found success as a licensed real estate agent and

developed a flourishing family life.  Defendant married, bought a home, and began raising two daughters.

Defendant's life took a turn towards the corrupt when he met Chan.  Defendant was dazzled by Chan's stature and flattered by Chan's interest in working with him.  Defendant eagerly accepted Chan's pitch to work closely together in a new, lucrative career.  Through defendant's participation in the racketeering scheme, he enjoyed levels of professional and financial success he never thought possible.  But because of his thirst for success, defendant ignored nagging feelings that his and his co-schemers' actions not only were wrong, but illegal.  Then, after gaining knowledge that their actions were, in fact, illegal, defendant continued, falsely believing that Chan would mastermind a path to get them out of it.

While defendant certainly was a keen participant who profited amply from their illicit arrangement, Chan plainly was the leader and defendant was the follower.  And as a natural and necessary consequence of defendant's criminal conduct, he swiftly lost almost all of what he had built: his career, his license, his reputation, his company, and much of his material wealth.  These natural (and deserved) consequences impacted defendant substantially and resulted in acute feelings of shame.

Defendant's decision to act on that shame productively to rebuild a meaningful and law-abiding life demonstrates his character and rehabilitation.  As detailed above, defendant accepted responsibility for his crimes and chose to cooperate with the government proactively and extensively.  Defendant's actions and testimony demonstrated a deep remorse for his conduct and support the conclusion that he is extremely unlikely to reoffend.

1    In addition to actively cooperating over the last five years,

2  defendant has worked hard to show his daughters a better example, to

3  support his family emotionally and financially, and to make amends to

4  them and to the community.  Defendant is actively involved in his

5  daughters' lives, driving his younger daughter to school, helping

6  with homework and activities, and being present for them emotionally.

7  Defendant also currently assists his ████████    father, who is in

8  ████████████████████████████████████████████

9  ████████████, and is a caretaker to his mother-in-law, who is

10 ████████████████████████████.  Over the last six

11 years, defendant has sought to make amends to the community through

12 service and charity work.  Since 2018, defendant has volunteered with

13 nonprofit organizations including Freedom Straightahead and Care

14 Mission Los Angeles on Skid Row, which aid unhoused and poor

15 individuals.  Defendant has donated financially and volunteered his

16 time to these organizations by handing out meals, clothes, shoes,

17 hygiene supplies, and school supplies.  Defendant also volunteers at

18 patient education seminars and health fairs and volunteered during

19 the COVID-19 pandemic to facilitate COVID testing for immigrants who

20 were afraid to come forward for testing and to educate them during

21 surges.

22    As noted above, defendant has worked full-time since he was 16

23 years old to support his family, which has continued after he was

24 charged in this case and lost his real estate licenses.  Defendant

25 began a career in the biotech industry, demonstrating a renewed

26 commitment to putting his life back on a productive path.  In this

27 role, defendant contributes meaningfully to his family (his income

28 constituting more than half of the family's monthly household income.

29

1    Defendant made meaningful changes in his life since he committed

2    the offense by accepting responsibility, cooperating with the

3    government, caring for his family members financially and physically,

4    and serving the community.  Defendant's history and characteristics

5    support a non-custodial term as they speak to his ability to be

6    productive outside of a custodial sentence and demonstrate that he is

7    extremely unlikely to reoffend.

8        **C.   Just Punishment and Deterrence**

9        The government's proposed sentence of a 12-month term of home

10   confinement and a high-end fine constitutes just punishment because

11   it is commensurate with the nature, scope, and seriousness of

12   defendant's crime as discussed above.  See 18 U.S.C. § 3553(a)(2)(A).

13   It also will serve the purposes of specific and general deterrence.

14       As to specific deterrence, defendant's acceptance of

15   responsibility, cooperation with the government, history and

16   characteristics, and substantial post-offense rehabilitation

17   demonstrate that he is not likely to reoffend.  Indeed, being caught

18   here and having suffered the many reputational and financial

19   consequences of his conduct appear to have deterred defendant.  Nor

20   does defendant engage in the type of work that helped enable his

21   criminal conduct in the first place.

22       Aside from specific deterrence, as the Court has recognized, the

23   primary victim of defendant and his co-schemers' crimes was the

24   public.  Corruption "demoralizes and unfairly stigmatizes the

25   dedicated work of honest public servants," undermining "the essential

26   confidence in our democracy."  Spano, 411 F. Supp. 2d at 940.

27   General deterrence is therefore especially important in public

28   corruption cases.  See United States v. Watkins, 691 F.3d 841, 853

1   (6th Cir. 2012) (general deterrence important to combat "widespread

2   corruption"); Spano, 411 F. Supp. 2d at 94 ("The only way to protect

3   the public from the ongoing problem of public corruption and to

4   promote respect for the rule of law is to impose strict penalties on

5   all defendants who engage in such conduct."). Defendant has begun

6   making amends to the public through his extensive charity work and

7   will continue to do so.

8       A meaningful sentence is imperative to promote general

9   deterrence and respect for the law. Here, the 12-month term of home

10  confinement and the high-end fine of $250,000 (which is a significant

11  penalty for defendant) conveys a concrete consequence for engaging in

12  bribery, while also appropriately crediting and incentivizing early

13  and substantial cooperation like defendant's, without which these

14  types of impactful corruption prosecutions might not be built.

15      **E.   Avoiding Unwarranted Disparities**

16      Section 3553(a)(6) requires the Court to minimize sentencing

17  disparities among similarly situated defendants. One way of doing so

18  is to correctly calculate the Guidelines range. See United States v.

19  Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the

20  Guidelines range was correctly calculated, the district court was

21  entitled to rely on the Guidelines range in determining that there

22  was no 'unwarranted disparity' . . . .").

23      Although defendant undertook a common scheme with Huizar and

24  Chan, he is not similarly situated to either for purposes of

25  sentencing. See United States v. Armstead, 421 F. App'x 749, 751

26  (9th Cir. 2011) (no unwarranted sentencing disparity where defendants

27  are not similarly situated); United States v. Gardner, 32 F.4th 504,

28  532 (6th Cir. 2022) (codefendants who cooperated with the government

and received "very significant 5K motions" were not "similarly situated" with non-cooperating defendants).  Considering all of the Section 3553(a) factors, many of which are especially mitigating here, defendant deserves a drastically different sentence from Huizar and Chan.  Most importantly, defendant substantially assisted the government in its investigation through his cooperation, which distinguishes him from both Huizar and Chan.  Moreover, defendant accepted responsibility years before Huizar did.  Indeed, defendant's early plea, assistance to the government, and willingness to testify at trial can fairly be viewed as a factor that ultimately led Huizar to plead guilty--and only then, years after he was charged and after the government already had begun significant preparations for his trial.  Defendant is also distinguishable from Chan, who proceeded to trial and has never expressed meaningful remorse nor acceptance of responsibility.

Defendant also is dissimilar from and less culpable than Huizar and Chan in terms of his offense conduct.  Unlike defendant, Huizar and Chan were public officials who were, respectively, the leader and manager of the racketeering conspiracy.  The marked difference between Huizar/Chan on the one hand and defendant on the other hand is reflected in their respective Guidelines ranges.  The government's recommended sentence of three years' probation with 12 months' home detention (as a substitute for imprisonment) is a small but meaningful variance from defendant's range of 12-18 months' imprisonment,[9] and all individual defendants the Court has sentenced

---

[9] Because the 12-18 month range the government recommends falls within Zone C of the Sentencing Table, the advisory Guidelines do not authorize a probationary sentence but nonetheless permit a sentence *(footnote cont'd on next page)*

in this case (Huizar, Chan, and developer David Lee) have received downward variances based upon the 3553(a) factors.[10]  The government's recommended near-Guidelines sentence balances the relevant aggravating and mitigating factors and accounts for the dispositions of other co-defendants in this case as well as defendant's unique personal history and characteristics.

## IV.   IMPOSITION OF THE MAXIMUM, HIGH-END FINE OF $250,000 AND 150 HOURS OF COMMUNITY SERVICE IS WARRANTED

The Court must impose one of the following as a condition of probation except in extraordinary circumstances: a fine, restitution, or community service.  (PSR ¶ 191.)  The statutory maximum, high-end range for a fine here is $250,000.  The government recommends the statutory maximum fine of $250,000 and 150 hours of community service to be completed during defendant's term of probation.

**Fine.**  The fine range for the offense level is $25,000 to $250,000.  See U.S.G.G. § 5E1.2(c)(3); PSR ¶ 194.  Defendant has agreed to pay the maximum fine of $250,000.  Although the PSR states that defendant has an immediate ability to pay a fine of **$25,000** and

---

that includes half of the minimum term of imprisonment to be served through home detention (as a condition of supervised release).  See U.S.S.G. §§ 5B1.1 cmt. n.2, 5C1.1(d)(2), 5F1.2.  The government's proposed sentence thus effectively constitutes a six-month downward variance from the advisory Guidelines range, i.e., six months in home detention instead of six months in prison.  To be clear, the government recommends the same sentence (which would constitute a modestly greater downward variance) should the Court find the total offense level is 15 with an advisory Guidelines range of 18-24 months, as the proposed sentence strikes the right balance under 18 U.S.C. § 3553(a) for all the reasons described herein.

[10] The Court imposed sentences consistent with an approximate five-level downward variance for Huizar, a seven-and-a-half level downward variance for Chan, and a six-month downward variance for Lee (the last of which is the approximate variance the government recommends here).  The USPO recommended a one-level downward variance for Huizar, a ten-level downward variance for Chan, and a five-level downward variance for Lee.

a second payment of $200,000 within 180 days, defendant has agreed to make a _higher_ immediate payment of **$152,000** with the balance of $98,000 due within six months of the judgment.  The government agrees that this arrangement is reasonable, based upon defendant's ability to pay and the relevant factors, including the impact of the payment schedule on defendant's dependents.  (See PSR ¶¶ 170-185; see U.S.G.G. § 5E1.2(d)(3) (the court should consider the burden that the fine places on the defendant and his dependents relative to alternative punishments).)

**Community Service.**  During the meet-and-confer process, defendant agreed to complete 150 hours of community service, which the government requests the Court impose as a term of probation.  See U.S.S.G. § 5E1.2(e).[11]

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to (1) three years' probation with conditions of (a) 12 months' home confinement and (b) 150 hours community service; (2) a fine of $250,000 ($152,000 due immediately, with the balance of $98,000 due within six months); and (3) a special assessment of $100.

---

[11] The government has recommended (1) 100 hours of community service for cooperator Justin Kim, who is employed full-time and serves as a full-time caretaker for parents; and (2) 300 hours for cooperator George Esparza.  Because defendant has a full-time job and substantial familial responsibilities, the government is recommending that the Court order 150 hours community service here.